IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES,                              3:11-CR-00442-BR

       Plaintiff,

                            OPINION AND ORDER

v.

JUSTIN J. SENATOR,

       Defendant.


**S. AMANDA MARSHALL**
United States Attorney
**CRAIG J. GABRIEL**
**JANE H. SHOEMAKER**
Assistant United States Attorneys
1000 S.W. Third, Suite 600
Portland, OR  97204
(503) 727-1012

       Attorneys for Plaintiff

**STEVEN J. SHERLAG**
621 S.W. Morrison Street
Suite 900
Portland, OR 97205
(503) 227-5200

       Attorney for Defendant

1 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Defendant Justin Senator's Motion (#103) to Dismiss Indictment with Prejudice and Motion (#105) to Suppress.  For the reasons that follow, the Court **DENIES** Defendant's Motions.


## BACKGROUND

On November 7, 2011, Defendant Justin Senator was charged in a two-count Information in a juvenile proceeding with Murder in the Second Degree in violation of 18 U.S.C. §§ 1111, 1153, and 5032 and with Using and Carrying a Firearm During and in Relation to a Crime of Violence in violation of 18 U.S.C. §§ 924(c) and 5032.

On January 31, 2012, the government filed a Motion to Transfer Juvenile Proceedings for Adult Prosecution pursuant to 18 U.S.C. § 5032.

On May 22, 2012, the Court issued an Opinion and Order granting the government's Motion to Transfer Juvenile Proceedings for Adult Prosecution.  Defendant appealed.

On February 4, 2013, the Ninth Circuit affirmed the Court's May 22, 2012, Opinion and Order.

On February 13, 2013, Defendant was charged in a two-count Indictment as an adult with Murder in the Second Degree in violation of 18 U.S.C. §§ 1111 and 1153 and with Using and

Carrying a Firearm During and in Relation to a Crime of Violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii).

On March 8, 2013, Defendant filed a Motion to Dismiss Indictment with Prejudice and a Motion to Suppress.

On March 22, 2013, the Court received evidence and heard oral argument on Defendant's Motions.

On March 25, 2013, the Court entered an Order directing the parties to file supplemental briefing to the extent that the government contends Defendant was taken into protective custody as a juvenile on May 30, 2010.

## DEFENDANT'S MOTION TO SUPPRESS

Defendant moves to suppress the results of the May 30, 2010, search of the van in which Defendant was a passenger and the results of the May 30, 2010, search of Defendant's person on the ground that the vehicle stop and search were done without a warrant, without reasonable suspicion, and/or without probable cause in violation of the Fourth Amendment to the United States Constitution.  Defendant also moves to suppress the statements he made on May 30, May 31, and June 1, 2010, on the ground that they were taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966); *i.e.*, in violation of Defendant's rights under the Fifth Amendment to the United States Constitution.

3 - OPINION AND ORDER

## I.    Findings of Fact

On March 22, 2013, the Court conducted an evidentiary hearing to determine the pertinent facts underlying Defendant's Motion to Suppress.  The government called four witnesses for that purpose:  Matthew David Smith, Daniel Komning, Gary R. Samuel, and Ronald Gregory.  In May 2010 all of these witnesses worked for the Warm Springs Police Department on the Warm Springs Indian Reservation and were involved in the investigation that led to Defendant's prosecution.  Defendant did not call any witnesses at the hearing.

The Court finds each of the witnesses testified truthfully to the best of his ability and that variances between their accounts are the normal inconsistencies expected from witnesses generally.  In any event, the Court does not find any reason to distrust the accounts of these witnesses, including, as noted below, the fact that an officer observed a male in dark clothing looking out from a window in the house at 1760 Bray Avenue. Having weighed and evaluated the testimony of the witnesses and the exhibits received in evidence for this hearing and having considered the arguments of counsel, the Court finds the following facts by a preponderance of the evidence:

1.    On May 30, 2010, at 3:45 a.m., Jose Morales and Jane Stwyer heard a loud noise that sounded like a gunshot while they were in the livingroom of their residence at 1796 Tao-Shuh

4 - OPINION AND ORDER

Street, Warm Springs, Oregon, on the Warm Springs Indian Reservation.  Morales and Stwyer walked outside to investigate. They saw a man later determined to be Timothy Red Dog lying on the ground and noted he did not appear to be breathing.  Morales observed two "guys" running uphill and to the northeast away from the scene towards Bray Avenue, one wearing a white sweater and the other wearing all black clothing.  Morales went back into his home and called 911.

2.    At 3:47 a.m. Warm Springs Police Officer Daniel Komning responded to the report of a shooting victim in front of 1796 Tao-Shuh Street.  Officer Komning found Red Dog's body in the street in front of the residence at 1796 Tao-Shuh Street lying on his back with a large amount of blood around his head.  Officer Komning also saw a .30/06 shell casing on the ground near Red Dog's body and immediately recognized the shell casing was the type of ammunition used in a long barreled, high-powered, handheld rifle and not in a handgun.

3.    Shortly after Officer Komning's arrival, Officer Matt Smith arrived at the scene.  He also saw Red Dog's body in the street lying on his back with blood on his face and hands and pooled behind his head, and he observed the large caliber rifle shell casing on the ground near Red Dog's body.

4.    To protect and to mark the location of the shell casing, Officer Komning took a small, plastic bowl from the

5 - OPINION AND ORDER

ambulance at the scene and put it over the shell casing in the
street.  He also took photos of the shell casing and the
immediate scene with a digital camera.

5.    Next to arrive was Warm Springs Police Sergeant Jason
Schjoll who, with Officers Smith and Komning, secured the scene
at 3:51 a.m. by placing a police line around it to keep people
out and to designate where the crime scene was located.

6.    After securing the crime scene, Officer Smith contacted
Morales and Stwyer at their residence.  Morales told Officer
Smith about hearing the noise that sounded like a gunshot, seeing
Timothy Red Dog, and seeing the "two guys" running towards Bray
Avenue, one wearing a white sweater and the other wearing all
black.

7.    After Warm Springs police detectives arrived on the
scene, Officer Smith was positioned at the intersection of
Tao-Shuh Avenue and West Hills Drive approximately 200 feet away
from 1760 Tao-Shuh Street.  From that position at about 5:35
a.m.[1] Officer Smith noticed a male subject in the window at the
southeast corner of the house at 1760 Bray Avenue where Officer
Smith knew Kaliska Wallulatum lived.  The male was "peering from
behind the curtain" and looking toward the crime scene.  Using
binoculars, Officer Smith noted the male was in black clothing,

_____

[1] The record reflects on May 30, 2010, sunrise occurred at
5:26 a.m.

but he did not recognize the male from that distance even with binoculars.

8.   About an hour later at approximately 6:35 a.m., Officer Smith saw Kaliska Wallulatum walking away from Bray Avenue towards him.  He conversed with her.  When he asked her whether she had seen or heard anything suspicious in the area earlier, Wallulatum said she had not.  Officer Smith asked Wallulatum who was at her home overnight, and she responded only she and her cousin, Jacquelyn Moody, were there.  Officer Smith then asked who was the male that Officer Smith had seen looking out of the southeast back window at her house, but Wallulatum responded there were not any male subjects at her house.

9.   At 7:30 a.m. Warm Springs Detective Gary Samuel and Federal Bureau of Investigation Special Agent Stanley Suenaga spoke to Kaliska Wallulatum and Jacquelyn Moody at 1760 Bray Avenue as part of an investigative canvass of the area. Detective Samuel asked Wallulatum and Moody if they had heard anything or seen anyone in the area earlier in the morning and whether there was anyone else in the house.  Wallulatum and Moody both told Detective Samuel that they were the only people in the house other than young children who were asleep in one of the back bedrooms.

10.  Detective Samuel and Special Agent Suenaga then moved next door and spoke to Share Linn Star, the occupant of the house

at 1758 Bray Avenue.  Star told them that she heard a loud noise around 3:30 a.m., and a short time thereafter she heard something or someone brushing up against the side of her house that is next to 1760 Bray Avenue (Kaliska Wallulatum's house).  Although Star looked out of her window, she could not see anything.

11.  Detective Samuel and Special Agent Suenaga also spoke to the occupants of 1754 Tao-Shuh Street, Bill McKay and Celia Ike, both of whom said they heard a gunshot early in the morning. Shortly after hearing the gunshot, McKay and Ike heard what sounded like two or more people arguing along the south side of their house and heading south towards 1758 and 1760 Bray Avenue.

12.  At 9:22 a.m. Officer Smith, who was on foot about a block and a half away from Kaliska Wallulatum's house, saw two males leaving it.  One was wearing a white shirt and the other was wearing a black coat, and the person in the white shirt was carrying something that was long and cylindrical like the shape of a rifle barrel with what looked like a black trash bag rolled up around it.  Officer Smith saw the two males get into a gold van that had pulled up in front of the driveway at 1760 Bray Avenue, which was approximately a block and a half away from Officer Smith.

13.  As Officer Smith observed the two males getting into the van, he also saw Officer Komning driving his patrol vehicle towards 1760 Bray Avenue.  Officer Smith radioed Officer Komning

that they needed to talk to the men in the van.

14.  By this point police collectively knew that (a) two "guys" (one wearing white and one in black) were seen leaving the crime scene immediately after the shooting and moving toward the area of Wallulatum's house; (b) a rifle-type shell casing was found next to Red Dog's body; (c) a male in black clothing had been "peering out" toward the crime scene from Wallulatum's house; (d) Wallulatum had denied to Officer Smith and then later to Detective Samuel and Special Agent Suenaga that any men were at her house that night; and (e) now two men were leaving Wallulatum's house, one wearing white and the other black, and one of them was carrying something long and black consistent with the shape of a long-barreled rifle.

15.  Officer Komning parked his vehicle on the same side of Bray Avenue as the Wallulatum house and approached the gold van on foot as it began to pull away from in front of the driveway. Officer Komning waved at the driver and asked through an already-open driver's window if he could "talk to you real quick." The driver of the van, Rose Ball, stopped the van in the middle of the street. Officer Komning then asked Ball to back up out of the road so the van was not blocking the flow of traffic. Ball backed up the van and parked it in front of the residence at 1760 Bray Avenue with the driver's side next to the sidewalk and the passenger side on the street. After the van was parked, none of

the passengers made any move to leave the van or indicated that they did not want to speak with Officer Komning.

16.   After the van was parked, Officer Komning walked up to the open driver's side window and stood by the rear-view mirror while talking with Ball.  Although the van had tinted windows, Officer Komning could see several male passengers through the open driver's side window in two rows of seats behind the driver. There were two passengers in the row behind the driver (the "middle" row) and two more in the third row.  Although Officer Komning recognized the passenger in the third-row passenger-side seat was Frederick Wallulatum, he could not see the occupant of the third-row driver's side seat.  Later the passengers in the van were identified as follows:  Jasper Smith and Julius Senator, Defendant's brother, were in the middle row of seats, but Officer Komning does not recall who was sitting on the driver's side and who was on the passenger side; Defendant was in the third-row seat on the driver's side; and, as noted, Frederick Wallulatum was in the third-row seat on the passenger side.

17.   As he spoke with Rose Ball, Officer Komning saw Frederick Wallulatum making movements that indicated he was either stuffing something under the middle row of seats directly in front of him or moving something around under those seats.

18.   At the same time Officer Komning asked Ball whether she had any knowledge of the events that had occurred that night.

10 - OPINION AND ORDER

Ball responded that she did not.  Officer Komning explained there had been a shooting on Tao-Shuh Street and police were canvassing the area to find witnesses or anyone with any information.  Ball put her head down; would not look at Officer Komning; and responded that she did not know anything about a shooting, that she had returned home at 2:00 or 2:30 a.m. after watching a movie, and that she then went straight to bed.  Ball also said the passengers in the van were relatives of hers, and she came to 1760 Bray Avenue to pick them up after she was called and asked for a ride, but she did not know where she was to take the passengers.

19.  By this point Officer Komning's reasonable suspicions were mounting that one or more of the passengers in the van may have been involved with the shooting and that there may be "officer safety" issues with Frederick Wallulatum's movements in the back of the van because Wallulatum could have been putting "anything" under the seat "a gun . . . drugs . . . knives . . . an array of things."

20.  Officer Komning asked Ball to ask the passengers to step out of the van, but Ball responded that she would not do that and Officer Komning would have to ask the passengers to step out of the van himself.

21.  While the passengers were still in the van, Officer Smith came to the van as well.

22.  Officer Komning asked the passengers to get out of the van, and the middle-row passengers, Jasper Smith and Julius Senator, stepped out immediately through the sliding passenger door.  Defendant and Frederick Wallulatum, however, did not leave the van.

23.  Officer Komning then again asked Defendant and Frederick Wallulatum to step out of the van, and they did so through the sliding passenger door.  As Frederick Wallulatum stepped out, it was noted he was wearing a white tank top undershirt and blue silk boxer shorts, but no pants.

24.  Officer Komning walked around to the passenger side of the van.  From his position standing outside of the van and looking through the open passenger sliding door without stepping into the van or moving anything inside the van, Officer Komning saw on the floorboard area just in front of the middle passenger-side seat a black plastic bag resembling the item that Officer Smith had told him the male subject in the white shirt was carrying towards the van.  Officer Komning noted the bag was "a couple" feet long and had a round, cylindrical, tube shape consistent with the shape and length of a rifle barrel.

25.  Officer Komning asked whose rifle it was in the van, but no one answered him.  Officer Komning asked Ball, who was still sitting in the driver's seat, whose rifle it was.  Ball responded that she did not know whose it was.

12 - OPINION AND ORDER

26.   At this point another officer, perhaps Sergeant Schjoll
or one of the detectives who had arrived at the van, pointed out
to Officers Komning and Smith that there was a noticeable bulge
in Jasper Smith's pants.   At that point Officer Komning patted
down Defendant, and Officer Smith patted down Jasper Smith.
Other officers patted down Frederick Wallulatum and Julius
Senator.   In the course of the pat-down of Julius Senator,
Detective Aaron Whittenberg discovered a smoking device that was
consistent with illegal drugs.   In the course of the pat-down of
Jasper Smith, Officer Smith discovered a rifle stock.

27.   At this point each of the four passengers had been
identified by name.

28.   By 9:36 a.m. Detectives Ron Gregory and Gary Samuels
came to the van.   Officer Smith briefed Detective Gregory,
specifically informing him that the rifle stock had been found in
Jasper Smith's pants during the pat down.   Detective Gregory then
spoke to Ball and asked her where the rest of the rifle was.
Ball motioned inside the sliding passenger door to the black
bagged item that Officer Komning had already seen on the floor in
front of the middle-row passenger seat.   Detective Gregory asked
Ball who brought the rifle into the van, and she responded one of
the passengers did, but she could not remember which one.

29.   At that point Detective Gregory reached into the van
and retrieved the black bagged item.   When he picked it up, he

13 - OPINION AND ORDER

felt a hard cylinder inside which, based on his training and experience, he believed to be a rifle barrel. As Detective Gregory placed the bag on top of the van, the ends of the bag began to unroll exposing part of the contents of the bag. There Detective Gregory saw the muzzle-end of a large caliber rifle, including the front site. Based on his experience, Detective Gregory thought this was probably the barrel of a .30 caliber rifle. Special Agent Suenaga ran the rifle's serial number through Warm Springs Police Dispatch and was advised it was reported as stolen from Hood River.

30. After Detective Gregory placed the plastic bag on top of the van, Detective Samuel asked Ball if she would consent to a search of the van. Ball asked if she had to allow a search, and Detective Samuel told her that she did not have to consent to a search. Ball asked to speak with Frederick Wallulatum about who pointed out to her that the police might impound the van if she did not consent to the requested search. Ball then agreed to a search as long as the van was not impounded, and Ball also signed a written consent to search the van.

31. There was not any direct evidence at the hearing that Ball owned the van. The Court notes, however, that Ball was the driver who brought the van to pick up the passengers. Moreover, both she and Detective Samuel referred to it as "her van" during their conversation. Finally, in the absence of any evidence to

14 - OPINION AND ORDER

the contrary, the Court infers the van belonged to Ball for purposes of her authority to grant the officers consent to search it.

32.  The officers then searched the van and found a pair of pants under the far rear seat of the van where Frederick Wallulatum had been sitting.  The officers reasonably concluded the pants had been worn by Wallulatum before he came out of the van in boxer shorts.  The officers found a bindle of suspected methamphetamine inside the pants pocket.  As part of this encounter, the officers arrested Frederick Wallulatum and took him in custody to the Warm Springs Police Department.  The Court infers Frederick Wallulatum was arrested on a drug charge.

33.  One of the detectives on the scene directed Officer Komning to take Defendant into custody.  Officer Komning placed Defendant into the rear of one of the patrol vehicles and transported him in custody to the Warm Springs Police Department.

34.  Defendant's mother, Deborah Leslie, was notified to come to the police station because Defendant was in custody.  Leslie arrived with her boyfriend, George Picard, Jr.  Leslie gave written consent for police to interview Defendant.

35.  Detective Samuel, Detective Gregory, Leslie, and Picard were all present with Defendant in the same room.  Before asking any questions, Detectives Samuel and Gregory both informed Defendant of his *Miranda* rights and his rights under the Indian

Civil Rights Act (ICRA), 25 U.S.C. § 1301, *et seq*. Detective Samuel pointed out that Defendant had a right to a lawyer at no cost to him under *Miranda*, but he would have to pay for any lawyer he requested under the ICRA.

36. Defendant and his mother seemed to understand the warnings and agreed to proceed with the interview that these detectives conducted in the presence of Leslie and Picard for less than an hour. Defendant seemed to understand the questions and responded appropriately under the circumstances. At the end of the interview, Defendant was released to Leslie and they left the police station.

37. The detectives thereafter obtained information that led them to believe Defendant was the one who shot Red Dog.

38. On May 31, 2010, Detective Samuel asked Leslie if she would be willing to bring Defendant back to the Warms Springs Police Department for a second interview. Leslie agreed, and at 9:43 p.m. that day Detectives Samuel and Gregory obtained consent from Leslie to interview Defendant again. Detectives Samuel and Gregory again advised Defendant about his *Miranda* and ICRA rights in front of Leslie, they both again appeared to understand and agreed to the second interview, and Defendant responded to questions for approximately 15 minutes. At the end of this second interview, the detectives detained Defendant. The Court infers Defendant was detained as a suspect in the murder of Red

Dog.  Defendant was then transported to the Northern Oregon Region Corrections (NORCOR) Juvenile Detention Facility.

39.  On June 1, 2010, at 5:55 p.m. Leslie gave consent for the detectives to interview Defendant a third time.  Detectives John Webb and Gregory conducted the initial portion of the interview, and Detective Samuel attended the remainder of the interview.  Defendant was again advised of his *Miranda* and ICRA rights in front of Leslie, and again both of them agreed to further questioning of Defendant.  At the end of this third interview, Defendant was released back into Leslie's custody.

## II.  Conclusions of Law

Based on these factual findings and the applicable legal standards, the Court makes the following Conclusions of Law:

### A.  Defendant's standing.

The government contends Defendant does not have standing to challenge the search of the van because he was a passenger without any possessory interest in the vehicle.  The government relies on *United States v. Pulliam*, 405 F.3d 782 (9th Cir. 2005), to support its contention.  In *Pulliam* the defendant was a passenger in a car stopped by police.  The officers ordered the defendant and the driver, who was the owner of the vehicle, out of the car; conducted a search of the vehicle; and found a gun under the passenger seat.  *Id*. at 784.  At some point the defendant admitted he owned the gun and was charged with being a

17 - OPINION AND ORDER

felon in possession of a firearm.   The defendant filed a motion

to suppress evidence of the gun.   The district court granted the

defendant's motion to suppress on the ground that even though

there was reasonable suspicion for the stop of the vehicle, there

was "no reasonable basis for going further, and . . . the car

search was invalid."   *Id*. at 785.   The Ninth Circuit reversed on

the ground that the defendant did not have standing to challenge

the search.   The Ninth Circuit reasoned:

> [T]he exclusionary rule reaches not only primary
> evidence obtained as a direct result of an illegal
> search or seizure, but also evidence later
> discovered and found to be derivative of an
> illegality or 'fruit of the poisonous tree.   It
> extends as well to the indirect as the direct
> products of unconstitutional conduct.   In this
> case, we must apply two well-established
> principles that limit the reach of the
> exclusionary rule.
>
> The first is that [a] person who is aggrieved by
> an illegal search and seizure only through the
> introduction of damaging evidence secured by a
> search of a third person's premises or property
> has not had any of his Fourth Amendment rights
> infringed.   Thus, a person seeking to exclude
> evidence allegedly obtained in violation of the
> fourth amendment must have standing to challenge
> the illegal conduct that led to the discovery of
> the evidence.   [T]o say that a party lacks fourth
> amendment standing is to say that his reasonable
> expectation of privacy has not been infringed.   It
> is with this understanding that we use "standing"
> as a shorthand term.
>
>                          * * *
>
> As a passenger with no possessory interest in the
> car Richards was driving, [the defendant] has no
> reasonable expectation of privacy in a car that
> would permit [his] Fourth Amendment challenge to a

> search of the car.  Furthermore, [the defendant]
> made no showing that [he] had any legitimate
> expectation of privacy in the . . . area under the
> seat of the car in which [he was] merely [a]
> passenger as this is an area[ ] in which a
> passenger *qua* passenger simply would not normally
> have a legitimate expectation of privacy.
> Similarly, the mere fact that [the defendant]
> claimed ownership of the gun does not confer
> standing upon him to seek its suppression.

*Id*. at 785-86 (quotations and citations omitted).  The Ninth

Circuit concluded

> [the defendant] has failed to demonstrate that the
> gun is in some sense the product of his detention.
> The officers conducted no interrogation of him
> before searching the car, and found nothing
> incriminating during the patdown.  Even if they
> had immediately released him rather than detaining
> him, the search of the car still would have
> occurred, and the gun would have been found.  The
> discovery and seizure of the gun was simply in no
> sense the product of any violation of [the
> defendant's] fourth amendment rights.

*Id*.

Defendant contends he has standing to challenge the

search even though he was a passenger in the van without any

possessory interest in the vehicle.  Defendant relies on *United*

*States v. Perez*, 689 F.2d 1336 (9th Cir. 1982), to support his

contention.

In *Perez* the defendant was a passenger in a vehicle

owned by Sanchez.[2]  United States Custom Officials asked Sanchez

if they could search his vehicle, and Sanchez consented to the

---

[2] The opinion does not provide Sanchez's first name.

19 - OPINION AND ORDER

search.  A dog trained in narcotics alerted officers at the
vehicle's gas tank.  When the officers searched the tank, they
found four pounds of heroin taped inside.  *Id.* at 1337.  The
district court took testimony from the defendant and others and
subsequently found the defendant and others had paid Sanchez $300
to transport the heroin across the border and that the defendant
had placed the heroin in the gas tank.  *Id.*  The district court
concluded the defendant did not have any reasonable expectation
of privacy in the truck or its contents and, therefore, did not
have a right to assert the search of the vehicle violated his
Fourth Amendment rights.  *Id.*  The Ninth Circuit reversed the
district court as follows:

> The district court found that the defendants paid
> Sanchez $300 to be their "mule."  Whatever language one
> chooses to characterize the relationship between the
> defendants and Sanchez, it is clear that a formalized
> arrangement had been made between them for the
> transportation of the contraband.  The defendants
> subsequently kept the truck under close surveillance,
> one riding in it and the other two following it, in
> order to make sure no one interfered with the carrying
> out of their plan and the delivery of their property.
> They took reasonable precautions to maintain their
> privacy interest.

*Id.* at 1338.  Accordingly, the Ninth Circuit concluded the
defendant had a legitimate expectation of privacy in the van; had
standing to challenge the search of the van; and the evidence of
the search, therefore, should be suppressed.  *Id.* at 1339.

Here the only evidence in the record related to
ownership of or authority to control the van is that Ball was

20 - OPINION AND ORDER

driving the van, it was "her van," the passengers were relatives, and she had been asked to come to 1760 Bray Avenue to transport passengers somewhere.  There is not any evidence that Defendant owned the van or paid Ball to drive him to a specific location.  In addition, Defendant specifically disclaims any possessory interest in the rifle barrel found inside the van.  Accordingly, the Court concludes as a matter of law that Defendant has not established he had a legitimate expectation of privacy in the van or its contents sufficient to challenge the search of the van.

Even if Defendant had standing to challenge the search of the van, however, the Court concludes for the reasons below that the stop, search of the van, pat-down of Defendant, and detention of Defendant were constitutional.

> **B.   Officer Komning's initial interaction with Ball at the van was a consensual exchange that did not require reasonable suspicion.**

In *Morgan v. Woessner* the Ninth Circuit noted "stops" of individuals fall into three categories under the Fourth Amendment:

> First, police may stop a citizen for questioning at any time, so long as that citizen recognizes that he or she is free to leave.  Such brief, "consensual" exchanges need not be supported by any suspicion that the citizen is engaged in wrongdoing, and such stops are not considered seizures. Second, the police may "seize" citizens for brief, investigatory stops.  This class of stops is not consensual, and such stops must be supported by "reasonable suspicion." Finally, police stops may be full-scale

> arrests.  These stops, of course, are
> seizures, and must be supported by probable
> cause.

997 F.2d 1244, 1252 (9th Cir. 1993)(citations omitted).

An encounter is consensual as "long as a reasonable person would feel free to disregard the police and go about his business." *Florida v. Bostick*, 501 U.S. 429, 434 (1991).  In *Bostick* the Court held police officers did not violate the Fourth Amendment by approaching bus passengers and asking for identification and consent to search baggage "as long as the officers [did] not convey a message that compliance with their requests [was] required." *Id*. at 437.  To establish a defendant did not consent to an encounter with police officers, a defendant must demonstrate "the officer's show of authority, in combination with other circumstances, [was] objectively so intimidating that an individual could reasonably believe that he was not free to disregard the police presence and go about his business." *Id*. (internal quotations and citation omitted).  The test as to whether an individual felt free to disregard police requests is an objective one; *i.e.*, the subjective belief of the person contacted is irrelevant to the question as to whether a seizure occurred.  *People of the Terr. of Guam v. Palomo*, 35 F.3d 368, 375 (9th Cir. 1994).  *See also United States v. Little*, 60 F.3d 708, 710 (10th Cir. 1995).

Here the record reflects Officer Komning approached the

22 - OPINION AND ORDER

van on foot and asked whether he could speak to Ball for a moment.  Officer Komning did not flash his badge, display a weapon, use an aggressive tone of voice, touch Ball or the van, or act in any manner to physically intimidate Ball or the passengers of the van.  There is not any indication on the record that Defendant, any of the passengers, or Ball sought to avoid the initial contact with Office Komning or sought to end the contact with him.

On this record the Court concludes as a matter of law that Officer Komning's initial encounter with Ball and the occupants of the van was a consensual one that did not require reasonable suspicion.  The Court, therefore, concludes Officer Komning's initial encounter with the van did not violate Defendant's Fourth Amendment rights.

**C.    The officers had reasonable suspicion to request Defendant to leave the van.**

The government conceded at oral argument that the second time Officer Komning asked Defendant and Frederick Wallulatum to leave the van, Defendant and Wallulatum were "seized" and the interaction with Defendant and the other passengers became an investigatory stop.

> In *Terry v. Ohio*, the Supreme Court created a limited exception to the general requirement that officers must have probable cause before conducting a search.  392 U.S. 1, 30 (1968).  The Court held that officers may conduct an investigatory stop consistent with the Fourth Amendment [when] "a police officer observes unusual conduct which leads him reasonably to conclude

in light of his experience that criminal activity may
be afoot. . . ." *Id*. In addition, an officer may
conduct a brief pat-down (or frisk) of an individual
when the officer reasonably believes that "the persons
with whom he is dealing may be armed and presently
dangerous." *Id*. The stop and the frisk, must be
analyzed separately; the reasonableness of each must be
independently determined.

*United States v. I.E.V.*, 705 F.3d 430, 440 (9th Cir. 2012)
(quotation omitted).

Under *Terry v. Ohio* a police officer may "seize" a
citizen for an investigatory stop if there is reasonable
suspicion that the citizen has committed or will commit a crime.
392 U.S. 1 (1968). "[R]easonable suspicion exists when an
officer is aware of specific, articulable facts which, when
considered with objective and reasonable inferences, form a basis
for particularized suspicion" that the person detained is engaged
in criminal activity. *United States v. Cotterman*, No. 09–10139,
2013 WL 856292, at *31 (9th Cir. Mar. 8, 2013)(quotation
omitted). An officer may perform a *Terry* stop only when under
the "totality of the circumstances" there is a "particularized
and objective basis for suspecting legal wrongdoing." *United
States v. I.E.V.*, 705 F.3d at 440 (9th Cir. 2012)(quotation
omitted).

The record reflects when Officer Komning directed
Defendant to get out of the van the second time, the officers
were aware of a shooting homicide in the vicinity of the van's
location; Morales told Officer Smith that he saw "two guys"

24 - OPINION AND ORDER

wearing white and all black leaving the scene and running towards
Bray Avenue; Star told Detective Samuel and Special Agent Suenaga
that after hearing a loud noise at 3:30 a.m., she heard something
or someone brushing up against the side of her house next to 1760
Bray Avenue; Bill McKay and Celia Ike told Detective Samuel and
Special Agent Suenaga that shortly after hearing the gunshot they
heard what sounded like two or more people arguing as they headed
south towards 1758 and 1760 Bray Avenue; Officer Smith saw a male
dressed in black looking out of the window of the back bedroom at
1760 Bray Avenue; Officer Smith saw a male subject in a white
shirt and a male subject in a black jacket leaving 1760 Bray
Avenue when he and others had been advised by Kaliska Wallulatum
and Jacquelyn Moody that there were not any males at the
residence; the male subjects were carrying a black bag of the
approximate size of a rifle, which they put in the van; Officer
Komning observed Frederick Wallulatum either placing or
rearranging something under the seat in front of him in a furtive
manner; and Ball put her head down and would not look at Officer
Komning when he asked her whether she had any knowledge of the
events of the evening.  These facts together were sufficient to
cause Officer Komning to reasonably believe there was a risk of
officer safety involved in his continued interactions with the
occupants of the van as well as to have a reasonable suspicion
that the van passengers might be engaged in criminal activity.

25 - OPINION AND ORDER

The Court concludes as a matter of law that Officer Komning's second request and the beginning of the *Terry* stop were supported by reasonable suspicion and, therefore, were not in violation of the Fourth Amendment.

**D.    The officers had reasonable suspicion and concerns for officer safety sufficient to pat down Defendant.**

To determine whether a pat-down is constitutional, the court must consider "(1) 'whether the officer's action was justified at its inception,' and (2) whether the officer's action was 'confined in scope' by engaging in a 'carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used to assault' an officer." *I.E.V.*, 705 F.3d at 435 (quoting *Terry*, 392 U.S. at 20, 29-30).  An officer must have "'specific and articulable facts' that indicate something more than a general 'governmental interest in investigating crime'" to justify a frisk. *Id.* (quoting *Terry*, 392 U.S. at 21, 23).  "[T]he appropriate analysis is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* (quotation omitted).

Here after Officer Komning saw Frederick Wallulatum making movements that indicated he was either stuffing something under the middle row of seats directly in front of him or moving something around under those seats and after the passengers were

26 - OPINION AND ORDER

out of the van, Officer Komning saw a black plastic bag on the
floorboard area just in front of the seat in which Frederick
Wallulatum had been sitting.  Officer Komning reasonably believed
it was the black bag Officer Smith had told him that he had seen
the male subject in the white shirt carrying towards the van.
Officer Komning noted the bag was "a couple" feet long and had a
round cylinder-shaped tube that he believed was consistent with
the shape of a rifle barrel.  When Officer Komning asked Ball
whose rifle it was in the van, she did not deny there was a rifle
in the van, but instead responded that she did not know whose
rifle it was.  In addition, while the passengers were standing
outside of the van, Sergeant Schjoll or one of the detectives
noticed a bulge in Jasper Smith's pants.  These facts together
with the totality of the circumstances known to the officers are
specific, articulable facts that created a reasonable suspicion
that the passengers could have "weapons which might be used in an
assault" and that justified a pat-down of Defendant as a
passenger of the van.

      Accordingly, the Court concludes as a matter of law the
pat-down of Defendant did not violate the Fourth Amendment.

    **E.   Protective custody of Defendant.**

      The government contends the police officers were

permitted to take Defendant into protective custody[3] on May 30,
2010, under Warm Springs Tribal Code (WSTC) § 360.210 because
"evidence adduced at the hearing could support a finding . . .
that at the time defendant was contacted by the police, he was a
'Neglected Juvenile' as defined under WSTC § 360.110(12)(d)."
Plaintiff contends there was not any evidence at the hearing that
police officers had a subjective belief or that it was
objectively reasonable for them to believe that Defendant was a
neglected juvenile, and, therefore, the police officers were not
justified in taking him into protective custody.

      WSTC § 360.210 provides in pertinent part:

   (1)   Any duly appointed juvenile officer or law
        enforcement officer employed by the Bureau of
        Indian Affairs or by the Warm Springs Tribe may
        take temporary custody of a juvenile if he or she
        reasonably believes that:

      (a)   The juvenile is [1] a delinquent juvenile,
           [2] a juvenile in need of supervision, or [3]
           a neglected juvenile; and

      (b)   Immediate temporary custody if necessary for
          the protection of the health, safety, welfare or
          morals of the juvenile or any other person, or to
          prevent the juvenile from committing a threatened
          or imminent criminal act, or to prevent the
          juvenile from leaving the Warm Springs Indian
          Reservation.

Gov't Supplemental Memo., Ex. 1 at 3-4.  The government concedes

---

[3] The government notes in its Supplemental Memorandum,
however, that it "did not advance the argument that defendant was
taken into protective custody after he was contacted on Bray
Avenue."

there is not any evidence in the record to support a finding that Defendant was a "delinquent juvenile" or "juvenile in need of supervision" at the time that he was contacted by police officers on May 30, 2010. The government, however, contends there was evidence adduced at the hearing to support a finding that Defendant was, in fact, a neglected juvenile. WSTC § 360.110(12)(d) defines a neglected juvenile as a juvenile whose parent or guardian has "created, allowed or failed to remedy a situation or occupation which causes or threatens to cause injury to the health, safety, welfare or morals of the juvenile." Gov't Supplemental Memo., Ex. 1 at 2. Specifically, the government notes at the time that Defendant was taken into custody, he was in the company of three adult males who possessed methamphetamine, a drug pipe, and a disassembled firearm consistent with the weapon used in a homicide only hours earlier.

As Defendant notes, however, there is not any evidence in the record that Defendant's parents created, allowed, or failed to remedy a situation that caused or threatened to cause injury to Defendant. There also is not any evidence that Defendant's parents were aware of Defendant's activities, his association with the other individuals in the van, or the activities of the other individuals in the van.

On this record the Court concludes the government has not established the police officers were authorized to take

29 - OPINION AND ORDER

Defendant into protective custody under WSTC § 360.210.

**F.    The Officers had probable cause to take Defendant into custody.**

Even though the officers did not have the authority to take Defendant into protective custody as a juvenile, the Court concludes in any event that the officers had probable cause to arrest Defendant on May 30, 2010.

A warrantless arrest is lawful only if there is probable cause "to believe that an offense has been or is being committed by the person being arrested." *Garber v. Vizcarra*, No. 11-56901, 2013 WL 603079, at *1 (9th Cir. Feb. 19, 2013) (quotation omitted).  "Probable cause to arrest exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." *United States v. Sims*, No. 11-50552, 2013 WL 223180, at *1 (9th Cir. Jan. 16, 2013)(quotation omitted).

The totality of the circumstances here included the following facts known to officers and detectives at the time of Defendant's detention on May 30, 2010:

The officers were aware of a shooting homicide in the vicinity of the van's location; Morales told Officer Smith that he saw "two guys" wearing white and all black leaving the scene and running towards Bray Avenue; Star told Detective Samuel and Special Agent Suenaga that after hearing a loud noise at 3:30

30 - OPINION AND ORDER

a.m., she heard something or someone brushing up against the side of her house next to 1760 Bray Avenue; Bill McKay and Celia Ike told Detective Samuel and Special Agent Suenaga that shortly after hearing the gunshot they heard what sounded like two or more people arguing as they headed south towards 1758 and 1760 Bray Avenue; Officer Smith saw a male dressed in black looking out of the window of the back bedroom at 1760 Bray Avenue; Officer Smith saw a male subject in a white shirt and a male subject in a black jacket leaving 1760 Bray Avenue after he and others had been advised by Kaliska Wallulatum and Jacquelyn Moody that there were not any males at the residence; the male subjects were carrying a black bag approximately the size of a rifle, which they put in the van; Officer Komning observed Frederick Wallulatum either placing or rearranging something under the seat in front of him in a furtive manner; and when Officer Komning asked Ball if she had any knowledge of the events of the evening, she put her head down and would not look at him.  In addition, a rifle barrel approximately the same size and caliber of the firearm that officers believed to be involved in the shooting was carried from 1760 Bray Avenue by one of two of the passengers to the van, and Jasper Smith, a passenger in the van, had the stock of the rifle in his pants.  Finally, Julius Senator was carrying a smoking device consistent with illegal drug use, and Frederick Wallulatum's pants contained a bindle of methamphetamine.

31 - OPINION AND ORDER

The Court concludes on this record as a matter of law that the totality of the circumstances known to the officers at the time of Defendant's detention on May 30, 2010, was sufficient to cause a prudent officer to conclude there was a fair probability that Defendant had committed a crime.  Accordingly, the Court concludes the officers had probable cause to arrest Defendant on May 30, 2010, and, therefore, Defendant was not arrested in violation of his rights under the Fourth Amendment.

**G.  Defendant was provided with constitutionally adequate warnings before each of his statements given on May 30, May 31, and June 1, 2010.**

An officer's obligation to give a suspect *Miranda* warnings before interrogation extends only to those instances when the individual is "in custody." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  For a statement made during a custodial interrogation to be admissible, any waiver of constitutional rights must be voluntary, knowing, and intelligent. *Miranda*, 384 U.S. at 479.  A valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of the defendant.  *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979).  To be knowing and intelligent, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  The test for voluntariness is "whether, considering the totality of the

32 - OPINION AND ORDER

circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Derrick v. Peterson,* 924 F.2d 813, 817 (9th Cir. 1990)(quoting *United States v. Leon Guerrero,* 847 F.2d 1363, 1366 (9th Cir. 1988)).  The government has the burden of showing a valid waiver.  *North Carolina v. Butler*, 441 U.S. at 373.  There is a presumption against waiver.  *Id*.

Each of Defendant's three interviews were given following adequate *Miranda* warnings that both Defendant and his mother understood.  There is not any evidence in the record that Defendant was confused as to his rights under *Miranda* or the ICRA.  Defendant was coherent, appeared to follow the detectives' recitation of his rights, and acknowledged he understood his rights both under *Miranda* and the ICRA.  There is not any basis, therefore, for the Court to conclude that the additional information provided about the ICRA requirement to pay for one's own lawyer rendered the *Miranda* warning inadequate.  Defendant, who was a minor at the time of the interviews, and his mother on his behalf each made a knowing, voluntary, and intelligent waiver of Defendant's rights.  The Court, therefore, concludes as a matter of law that Defendant's statements in each interview are admissible.

In summary, the Court concludes the stop and search of the van, the pat-down search of Jasper Smith, the detention of

33 - OPINION AND ORDER

Defendant, and the interviews of Defendant were each conducted in a constitutionally appropriate manner.  Accordingly, the Court denies Defendant's Motion to Suppress.

## DEFENDANT'S MOTION (#103) TO DISMISS INDICTMENT WITH PREJUDICE

Defendant seeks dismissal of the Indictment "to remedy the government's destruction of videotape evidence."  In the alternative, Defendant seeks to suppress all evidence that would have been captured on the videotape of the initial crime scene, which, according to Defendant, includes:  "(1) the alleged placement of objects at the crime scene; and (2) any and all conclusions based upon the placement of objects at the crime scene."

### I.   Findings of Fact

Based on evidence presented at the March 22, 2013, hearing, the Court finds the following facts by a preponderance of the evidence:

1.   Detective Gregory made a video record of the crime scene on May 30, 2010, between 6:00 and 6:30 a.m. for approximately five minutes using a digital video camera belonging to the Warm Springs Police Department.

2.   Before, during, and after the time that Detective Gregory was recording the crime scene on the digital video camera, Officer Komning was taking photographs of the crime

34 – OPINION AND ORDER

scene.

3.    Officer Komning took 85 photographs of the crime scene that depicted all of the visual evidence contained on the digital video recording.

4.    After he finished recording the crime scene, Detective Gregory put the camera away at the police station.

5.    Detective Gregory forgot to give the camera to Detective Sam Williams to download and to preserve the video because Detective Williams was away at training at the Enforcement Training Center (FLETC) in Glynco, Georgia, at the time of the crime and did not return until late August or early September 2010.

6.    Detective Gregory first realized he forgot to put the video into evidence in January 2012 when Assistant United States Attorney Craig Gabriel advised him that defense counsel had requested a copy of the video.

7.    When Detective Gregory went to retrieve the video from the camera, he discovered it had accidentally been recorded over.

8.    The video recorder was sent to the Federal Bureau of Investigation's Northwest Regional Computer Forensics Laboratory (NWRCFL) to determine whether the video could be recovered from the camera's memory.  The camera was examined by Special Agent Gary Lorin with the assistance of examiner Kent Hughes as well as Forensic Examiner Steven Johns.  It was determined the video of

35 – OPINION AND ORDER

the crime scene was not recoverable.

## II.  Conclusions of Law

Generally "the suppression by the prosecution of evidence favorable to the accused upon request violates due process [when] the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Arizona v. Youngblood,* 488 U.S. 51, 55 (1988).  In contrast, "the Due Process Clause 'requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.' . . . [T]he failure to preserve this 'potentially useful evidence' does not violate due process 'unless a criminal defendant can show bad faith on the part of the police.'" *Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004)(quoting *Youngblood*, 488 U.S. at 58).

The Court concludes the video at issue here would not have provided Defendant with any information that is not obtainable via the 85 photographs taken simultaneously with the video at the crime scene.  In addition, there is not any evidence of bad faith on the part of Detective Gregory or any other police officer or detective related to the destruction of the video.  The video was

recorded over by accident, and the destruction of the crime scene video was unintentional.

Accordingly, the Court denies Defendant's Motion to Dismiss.

## **CONCLUSION**

For these reasons, the Court **DENIES** Defendant's Motion (#103) to Dismiss Indictment with Prejudice and Defendant's Motion (#105) to Suppress.

IT IS SO ORDERED.

DATED this 11th day of April, 2013.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge

37 - OPINION AND ORDER